WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Debora Saliego,<br><br>      Plaintiff,<br><br>v.<br><br>SRP, et al.,<br><br>      Defendants. | No. CV-22-08045-PCT-DLR<br><br>**ORDER** |

Plaintiff Debora Saliego alleges that her employer, Defendant Salt River Project Agricultural Improvement and Power District, violated Title VII of the Civil Rights Act of 1964 by discriminating against her because of her race and sex and by retaliating against her for engaging in protected activity. Plaintiff also alleges that Defendant violated the Age Discrimination in Employment Act ("ADEA") by discriminating against her because of her age. Before the Court is Defendant's motion for summary judgment (Doc. 27), which is fully briefed (Docs. 32, 33).[1] For the following reasons, Defendant's motion is granted.

**I.    Background[2]**

---

[1] Defendant's request for oral argument is denied because oral argument will not help the Court resolve the issues presented. *See* LRCiv. 7.2(f).

[2] In her brief, Plaintiff frequently cites to Exhibit B. (Doc. 32-3 at 2-50.) She does not explain to the Court what Exhibit B is, but according to Defendant, Exhibit B consists of "conclusory, unsupported statements that Plaintiff has inserted into the position statement that [Defendant] submitted to the EEOC in response to Plaintiff's Charge of Discrimination." (Doc. 33 at 5.) Though Plaintiff also submitted a declaration with the blanket assertion that all of her exhibits are true to the best of her knowledge (Doc. 32-4), the Court agrees with Defendant that Exhibit B—to the extent it can be understood at all—largely consists of conclusory statements and arguments, which the Court does not

Defendant hired Plaintiff, a Navajo woman over the age of 40, in 2008 as an Environmental Scientist/Engineer. (Doc. 27-2 at 12.) At the time, Plaintiff held Bachelor's and Master's degrees in Industrial Management. (*Id.* at 11-12.) After two years, Defendant promoted Plaintiff to Senior Environmental Scientist/Engineer, a role under the direct supervision of Paul Ostapuk. (*Id.* at 12.)

Plaintiff, along with 432 other employees, worked at the Navajo Generating Station ("NGS") on the Navajo Nation. (*Id.* at 3.) Defendant partly owned and operated NGS, and Plaintiff's primary responsibilities at the plant were monitoring and managing hazardous waste. (*Id.* at 29-31.) Plaintiff worked at NGS without issue until NGS's owners decided in February 2017 to cease operations at the plant, to be effective when NGS's lease with the Navajo Nation expired in December 2019. (Doc. 1 ¶¶ 20-22.)[3] Shutting down the plant resulted in a decision for Defendant—either lay off NGS's employees or devise a solution for extending their employment with the company. (Doc. 27-2 at 2-3.)

Defendant chose the latter by establishing a voluntary redeployment program (the "Redeployment Program"). (*Id.* at 3.) Under the Redeployment Program, each NGS employee was guaranteed a one-time offer to lateral into a new position within the company, accompanied by an $8,000 relocation allowance (the "Redeployment Offer"). (*Id.* at 39-44.) Defendant's stated goal was for each Redeployment Offer to be comparable to the employee's current position but, in the event the Redeployment Offer paid less than

---

consider. *See Travelers Cas. & Sur. Co. of Am. v. Telstar Const. Co., Inc.*, 252 F.Supp.2d 917, 923-24 (D. Ariz. 2003) (holding that a conclusory affidavit failed to establish foundation). What's more, this manner of presenting evidence is unhelpful. Exhibit B is not presented in the form of an affidavit or declaration and the document is nearly indecipherable. It seems to periodically contain annotations disputing positions Defendant took before the EEOC. Those annotations appear in the same font style as Defendant's positions, set apart only by asterisks, making it even more difficult to understand. Plaintiff is not *pro se*; she's represented by counsel, and "lawyers are tasked with bringing clarity out of chaos[.]" *Hunton v. Am. Zurich Ins. Co.*, No. CV-16-00539-PHX-DLR, 2018 WL 1182552, at *6 (D. Ariz. Mar. 7, 2018) (quotation and citation omitted). Exhibit B is chaotic. The Court reminds counsel that "[j]udges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

[3] Plaintiff stated in her complaint that she "began experiencing discriminatory behavior after she first applied for FMLA in early 2016," (Doc. 1 ¶ 20) but she produced no evidence relating to her FMLA application.

85% of the employee's current wage/salary, the employee was eligible for severance benefits. (*Id.* at 39-42.)

In conjunction with the Redeployment Program, Defendant encouraged NGS employees to utilize the company's usual bidding process to seek other desirable jobs in the company. (*Id.* at 3.) To enhance the effectiveness of the usual bidding process for NGS employees, Defendant initiated an "NGS Preference Plan," under which NGS employees could begin bidding for open positions sooner than other interested candidates. (*Id.* at 49.) Defendant went further by permitting departments to exceed their budgets by creating new so-called over the table of organization ("Over TO") jobs, which NGS employees were encouraged to bid on as well. (*Id.* at 4.) With these mechanisms in place to facilitate transfers within the company for NGS employees, there was one important limitation built into the Redeployment Program: If an employee declined a job offer, either through the Redeployment Program or through the employee's own bidding efforts, the employee forfeited the right to another guaranteed offer, the right to accept any Over TO positions, and the benefits of the NGS Preference Plan. (*Id.* at 37.)

To provide favorable Redeployment Offers, Defendant employed a mapping process whereby it assessed factors, such as experience and qualifications, to match NGS employees with open positions suitable to them. (*Id.* at 4.) After a mapping occurred, Defendant would email NGS employees a notification that they were a potential match for a mapped position and that this new position might ultimately be presented to the employee as their one-time Redeployment Offer. (*Id.* at 35-36.) If an employee eventually received a formal offer, they were given one week from initial notification to accept or decline the Redeployment Offer. (*Id.* at 39.) Employees were advised in writing when their Redeployment Offer was formally being conveyed, and the offer letter included a disclaimer stating that the employee understood that turning down the Redeployment Offer removed any guaranty of an additional job offer. (*Id.* at 39, 92.) All NGS employees were provided access to a manual prescribing these policies and procedures to be followed in

1  carrying out the Redeployment Program, and all NGS status information was posted to a
2  website. (*Id.* at 34.)

### A. The Water Sampling Incident

In December 2017, an NGS chemist conducted pond water testing as part of NGS shutdown operations. (*Id.* at 54.) Ostapuk, who oversaw the testing, provided Plaintiff with the results, and Plaintiff raised a concern about the testing procedure to Ostapuk and Andrea Martinez, a corporate manager who worked for Defendant. (*Id.* at 18-19.) Ostapuk and Martinez both dismissed Plaintiff's concerns and assured her that the proper technique was followed. (*Id.*) Unassuaged, Plaintiff then sought advice from third-party consultant McCoy and Associates who had recently provided Plaintiff with training on the Resource Conservation and Recovery Act. (*Id.* at 16.) Plaintiff emailed an associate from McCoy with questions about the pond water testing to ensure the validity of the analytical results. (*Id.* at 19.) Plaintiff understood that certain information in her email was confidential, but she believed this action to be permissible based on conversations with other colleagues who told her they routinely send sensitive questions to McCoy. (*Id.*)

Word of Plaintiff's email apparently spread. Plaintiff overheard a colleague, Mario Gorman, and a contractor, Gordon Hershel, refer to her as a "bitch," "witch," and "whistleblower." (*Id.* at 16.) Plaintiff confronted the two men, telling them that they should conduct themselves more professionally in the workplace. (*Id.*) Neither Gorman nor Hershel is alleged to have any influence in Defendant's hiring practices, but they expressed to Plaintiff that they were upset with her for interfering with their project. (*Id.*)

### B. Defendant's Efforts to Redeploy Plaintiff

In March 2019, Defendant informed Plaintiff that she had mapped to a Senior Environmental Scientist/Engineer position at Defendant's Crosscut facility. (*Id.* at 21.) This position carried the same title that she held at the time, and the hiring manager for the position was Jim Kudlinski. (*Id.*) Kudlinski interviewed Plaintiff for the position to gauge her interest, but Plaintiff informed him that she had submitted a bid for an Over TO position as a State and Local Legislative Analyst, a job which she preferred over the position with

Kudlinski. (*Id.*) Understanding that an official Redeployment Offer would render Plaintiff ineligible for Over TO positions under the Redeployment Program, Kudlinski declined to offer Plaintiff the Senior Environmental Scientist/Engineer position to allow her to pursue the Legislative Analyst position. (*Id.* at 60.) Kudlinski instead hired Jeff Frensdorf, a white male over the age of 40. (*Id.*)

In May 2019, Defendant posted 18 "Site Services" positions. (*Id.* at 82-84.) Defendant identified these positions as necessary for the decommissioning of the plant, and, in its notification email to NGS employees, Defendant noted that Seniority and Navajo preference would be used to fill the positions. (*Id.*) Plaintiff declined to apply for any of the Site Services positions because she was "overqualified for the laborer positions and [didn't] have direct experience for the salaried positions." (*Id.* at 86.) All Site Services positions were offered to Navajo individuals, one of whom was a woman. (*Id.* at 5.)

On June 4, 2019, Defendant informed Plaintiff that she had again mapped to a Senior Environmental Scientist/Engineer position, this one located at Defendant's Coolidge facility. (*Id.* at 88.) On June 10, 2019, Defendant formally offered Plaintiff the position, constituting her one Redeployment Offer under the Redeployment Program. (*Id.* at 90.) Plaintiff was still interested in the Policy Analyst position and declined the offer, making her ineligible for any Over TO positions, including the Policy Analyst position that she was interested in. (*Id.* at 92.) With Plaintiff now removed from contention for the job, the Policy Analyst position was eventually awarded to Dinenizhoni Hill, a Navajo male under the age of 40. (*Id.* at 97.)

On October 16, 2019, Plaintiff sent an email to Michael Hummel, Defendant's CEO, claiming that she had been discriminated against because of her race and sex and that she had been retaliated against because she sought out advice from McCoy and Associates as it related to the water sampling incident.[4] (*Id.* at 102-105.) Defendant retained an independent investigator to look into Plaintiff's allegations, but the investigator found

---

[4] Though Plaintiff vaguely asserts in her brief that she "repeatedly complained about discrimination," (Doc. 32 at 7) she fails to offer details and cites no supporting record evidence.

insufficient supporting evidence. (*Id.* at 6-7.) NGS closed shortly after on November 21, 2019, ending Plaintiff's employment. (*Id.* at 14.) In a last-ditch effort to retain Plaintiff's employment and allow her to continue bidding on open positions, Defendant offered to reinstate her on a temporary basis for six months as a community resource worker with Coconino County. (*Id.* at 26.) Plaintiff again declined. (*Id.*)

In March 2022, Plaintiff filed this action, asserting claims against Defendant under Title VII, which prohibits employers from discriminating against employees based on race or sex, and from retaliating against employees for engaging in certain protected activities. *See* 42 U.S.C. §§ 2000e-2(a), 2000e-3. Plaintiff also asserted a claim against Defendant under the ADEA, which prohibits employers from discriminating against employees based on age. *See* 29 U.S.C. § 623(a). Plaintiff claims that Defendant violated Title VII and the ADEA by failing to hire her after the closure of NGS, and by retaliating against her for reporting perceived issues with certain water sampling techniques. Defendant seeks summary judgment on all claims. If not granted, Defendant seeks summary judgment limiting Plaintiff's damages due to her alleged failure to mitigate damages. (Doc. 27.)

**II.     Legal Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477

U.S. at 323. The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id.* at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted). Conclusory allegations, unsupported by factual material, are insufficient to defeat summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). If the non-movant's opposition fails to cite specifically to evidentiary materials, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1988).

### III. Discussion

Defendant makes four arguments for summary judgment: (1) Plaintiff cannot establish a prima facie case of race, sex, or age discrimination because she was either ineligible, did not apply, or removed herself from consideration for each of the identified positions; (2) even if Plaintiff can establish a prima facie case of discrimination, Defendant had a legitimate, non-discriminatory reason for not hiring her; (3) Plaintiff cannot establish a prima facie case of retaliation because she cannot demonstrate that she engaged in protected activity; and (4) Plaintiff is not entitled to back pay or front pay because she failed to mitigate her damages.[5] Because the Court finds that Defendant is entitled to summary judgment on Plaintiff's discrimination and retaliation claims, it need not reach Defendant's alternative request to limit damages.

#### A. Sex, Race, and Age Discrimination

Courts employ the burden-shifting *McDonnell Douglas* framework when analyzing

---

[5] Defendant also argues that Plaintiff cannot succeed on a claim for harassment because the alleged conduct does not rise to the level of an unlawful, hostile work environment. Plaintiff's briefing ignores this argument. Because Plaintiff has not disputed any of Defendant's assertions or arguments regarding hostile work environment, Defendant is entitled to summary judgment on this claim. *See Celotex*, 477 U.S. at 322.

- 7 -

Title VII and ADEA discrimination claims. *See Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123 (9th Cir. 2000); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1280-81 (9th Cir. 2000). Under this framework, the plaintiff bears the initial burden of demonstrating a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff makes this threshold showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. *Chuang*, 225 F.3d at 1123-24. If the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is mere pretext. *McDonnell Douglas*, 411 U.S. at 804-05.

To establish a prima facie case of discrimination, a plaintiff must show that: (1) she is a member of a protected class, (2) she applied and was qualified for a job for which the employer was seeking applicants, (3) she was rejected despite her qualifications, and (4) the employer continued to seek applicants of comparable qualifications for the position. *McDonnell Douglas*, 411 U.S. at 802. The requisite degree of proof on summary judgment is minimal. *Chuang*, 225 F.3d at 1124.

This said, "nothing compels the parties to invoke the *McDonnell Douglas* presumption." *Costa v. Desert Palace*, 299 F.3d 838, 855 (9th Cir. 2002). Plaintiffs may instead "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the defendant's actions. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1120 (9th Cir. 2004). Plaintiff ostensibly hangs her hat on this alternative approach. In her brief, Plaintiff does little more to conform her arguments to the *McDonnell Douglas* framework than mechanically set forth the test's elements and conclusively state that the elements are satisfied. (Doc. 32 at 10-11.) Nearly all of Plaintiff's brief instead focuses on the alternative *McGinest* framework.

Under either framework, however, Plaintiff must produce some evidence suggesting that Defendant's failure to hire her was due at least in part to discriminatory intent. *McGinest*, 360 F.3d at 1123. Because Title VII and ADEA claims share the same burdens

of proof and persuasion, the Court combines its analysis. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 888 (9th Cir. 1994).

Plaintiff's discrimination claims essentially boil down to this: Plaintiff was subjected to unlawful discrimination between February 2017 and December 2019, the period of time between the decision to shut down NGS and the plant's eventual closure. And she abstrusely argues that there were numerous instances in which she was overlooked for open positions that were eventually filled with individuals outside of her protected classes. Plaintiff's argument falters from the start, however, because she either did not apply or was not qualified for the positions she identifies, and she has not offered evidence that the individuals who filled those positions were similarly situated, in that they too either did not apply or were not qualified. *See Rose v. Well Fargo & Co.*, 902 F.2d 1417, 1423 (9th Cir. 1990) (stating that an inference of discrimination is supported only when the plaintiff can show that others similarly situated, but not in the protected class, were treated more favorably) (internal quotations and citation omitted). Plaintiff, therefore, has not established a prima facie case of discrimination.

Even assuming that Plaintiff sufficiently set forth a prima facie case of discrimination, she has not produced evidence demonstrating that Defendant's reason for not awarding her a new position within the company is pretextual and unworthy of credence. *See Texas Dept. of Cmty. Affs.*, 450 U.S. 248, 256 (1981). Defendant proffers a legitimate nondiscriminatory reason for not hiring Plaintiff into a new position, namely that company policy required employees to affirmatively bid on positions to be considered. (Doc. 27 at 10.) Defendant had no obligation to rehire Plaintiff as part of the Redeployment Program or any other internal hiring process. *See Rose*, 902 F.2d at 1422.

To rebut this legitimate nondiscriminatory purpose, Plaintiff points to four pieces of evidence, none of which calls into question whether Defendant's articulated reason is mere pretext for unlawful discrimination. Plaintiff first claims that Defendant has exhibited "general discriminatory intention regarding Native Americans" since as early as 2008. To

support this claim, which is only relevant to the race discrimination issue, Plaintiff identifies a 2008 newspaper article and a 2012 lawsuit. (Doc. 32 at 13-14.)

The 2008 newspaper article relates the story of a female, Native American NGS employee who claimed to have been passed over for a promotion to a position that instead went to a white male. (Doc. 32-2 at 21.) The employee from the article alleged that her interviewer informed her, contrary to company policy, that Navajo preference did not apply for managerial positions. The facts from the article were contested by the interviewer who denied making the remark, and the employee's unverified story from the article took place nearly a decade before Plaintiff's complaints about discrimination in this case began.

The 2012 lawsuit, *SRP v. Lee*, 672 F.3d 1176 (9th Cir. 2012), pertained to Defendant's authority to exercise control over employment relations at NGS without interference by the Navajo Nation. In the material cited by Plaintiff, the court analyzed only issues of joinder under Federal Rule of Civil Procedure 19, and it held that the Navajo Nation was not a necessary party because the tribal officials named in the lawsuit could be expected to adequately enforce the Navajo Preference in Employment Act on the tribe's behalf. *Id.* at 1182. Other than the fact that *Lee* involved issues of Navajo hiring preference at NGS, it did not address any claims relevant to the lawsuit at hand.

Neither the 2008 newspaper article nor the 2012 lawsuit shed any light on whether discriminatory intent can be inferred by Defendant's Redeployment Program. Past employment practices do not "reasonably permit the inference that [Defendant] was more likely motivated by [Plaintiff's race] than by the reasons it articulated." *Cotton v. City of Alameda*, 812 F.2d 1245, 1248 (9th Cir. 1987). The article and lawsuit reveal nothing about Defendant's failure to hire Plaintiff in the specific instances at issue here. If anything, the article and lawsuit show that Defendant had a policy of discriminating *in favor of* Native Americans over the past several decades.[6]

---

[6] Plaintiff argues that Defendant's history of preferencing Navajo employees is relevant to this suit because closing NGS would be "the best way to avoid preferential treatment" as "the vast majority of employees were Native American." (Doc. 32 at 12.) Absent any other evidence that the decision to shut down NGS was pretextual, the Court disagrees that Plaintiff's speculative argument is a reasonable inference that may be drawn from the record.

Next, Plaintiff claims that the "verbal harassment" she was subjected to by her colleagues, Gorman and Herschel, "shows that a discriminatory reason more likely than not motivated the Defendant." (Doc. 32 at 12.) The specific harassment Plaintiff refers to is the name-calling after the water sampling incident. These comments, however reprehensible, cannot impute discriminatory animus to the decision-makers in Defendant's hiring processes. Plaintiff has not alleged that either Gorman or Herschel had any involvement in the hiring process for the jobs she was interested in. Without presenting any evidence that Defendant failed to hire Plaintiff because its "decision makers were influenced or even aware of the alleged gender bias of some of its agents," the comments by Gorman and Herschel are not suggestive of a pretextual justification for failing to hire Plaintiff. *Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005); *Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1039-40 (9th Cir. 2005).

Finally, Plaintiff claims that she was "excluded from meetings" and that this constitutes circumstantial evidence of discriminatory intent. (Doc. 32 at 13.) But she cited to no evidence in her opposition brief indicating which specific meetings she might be referring to, and the Court therefore is unable to discern how this unsubstantiated claim might be indicative of pretext.

Plaintiff attempts to analogize her case to *Flores v. City of Phoenix*, No. CV-11-492-PHX-GMS, 2012 WL 293371 (D. Ariz. Feb. 1, 2012), where a Native American man brought claims against his employer of race discrimination, retaliation, and intentional infliction of emotional distress. *Flores* is entirely inapposite to Plaintiff's discrimination claims, however. In *Flores*, the court dismissed the plaintiff's race discrimination claim for failing to satisfy the four-year statute of limitations and for failing to put forward more than broad and conclusory allegations in the complaint. *Id.* at *2-3. That case was also decided under a motion to dismiss standard rather than a motion for summary judgment standard. *Id.* at *2. It lends no support to Plaintiff's argument that Defendant's actions were more likely than not motivated by racial animus.

Because Plaintiff has failed to make a prima facie case of discrimination, or to present sufficient evidence to create a genuine issue of material fact as to whether Defendant's articulated reason for not hiring her for a new position within the company was merely pretext for discrimination, Defendant is entitled to summary judgment on the sex, race, and age discrimination claims.

**B. Retaliation**

Retaliation claims are also governed by the *McDonell Douglas* burden-shifting framework. *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). To establish a prima facie case of unlawful retaliation, Plaintiff must show that (1) she engaged in protected activity; (2) she was thereafter subjected by her employer to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005). If Plaintiff makes her prima facie case of retaliation, the burden shifts to Defendant to provide a legitimate, non-retaliatory reason for its actions. *Id.* If Defendant meets its burden, Plaintiff must submit evidence indicating Defendant's proffered reason is merely pretext. *Id.*

To satisfy the first element, Plaintiff's "protected activity must be protected by the statutes [she] sues under." *Lalau v. City & Cnty. of Honolulu*, 938 F.Supp.2d 1000, 1018 (D. Haw. 2013). Here, Plaintiff sued under Title VII and the ADEA. Title VII protects an employee's right to oppose practices prohibited by Title VII and to make a charge, testify, assist, or participate in any manner in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a). Likewise, the ADEA protects an employee's right to oppose practices prohibited by the ADEA and to make a charge, testify, assist, or participate in any manner in an investigation, proceeding, or litigation under the ADEA. *See* 29 U.S.C. § 623(d). Neither statute protects the activity for which Plaintiff claims she was retaliated against here.

In Plaintiff's brief opposing summary judgment, she argues only that "the filing of [sic] complaints of violations of EPA rules and regulations" was protected. (Doc. 32 at 17.)

By this, Plaintiff refers to the water sampling incident in October 2018 where she reported purported improper sampling techniques to her supervisors.[7] But reporting alleged misconduct unrelated to discrimination does not constitute "protected activity" under either Title VII or the ADEA. *See Graber v. Zaidi*, No. 3:09-cv-00475-RAM, 2010 WL 3238918, at *5-6 (D. Nev. Aug. 12, 2010) (holding that a generalized complaint to an employer is not protected when it is not in reference to unlawful discrimination). Plaintiff's argument fundamentally misunderstands the function of the retaliation statutes on which she rests her case, and Defendant is thus entitled to summary judgment on this claim.

**IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 27) is **GRANTED**. The Clerk is directed to enter judgment accordingly and terminate this case.

Dated this 7th day of November, 2023.

Douglas L. Rayes
United States District Judge

---

[7] Plaintiff alleged in her Charge of Discrimination with the Arizona Attorney General's Office that she was "retaliated against because [she] complained of discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964 as amended." (Doc. 32-3 at 61.) However, Plaintiff does not advance this contention in her brief opposing summary judgment and does not cite to specific evidentiary material supporting it. The Court need not "search the entire record for a genuine issue of fact, even though the adverse party does not set it out in the opposition papers." *Carmen*, 237 F.3d at 1031. The Court accordingly limits its analysis to the argument presented by Plaintiff in her brief.